Freeman S. HURD

v.

ILLINOIS BELL TELEPHONE COMPANY et al.

Harley A. SEYBOLD et al.

v.

WESTERN ELECTRIC COMPANY et al.

No. 51 C 577.

United States District Court
N. D. Illinois.
Sept. 27, 1955.

**128**

Maurice Walk, Harry R. Booth, Chicago, Ill., for plaintiffs.

Kenneth F. Burgess, Douglas F. Smith, Arthur R. Seder, Jr., Chicago, Ill., and Sidley, Austin, Burgess & Smith, Chicago, Ill., for certain defendants.

Clyde E. Shorey, Clyde E. Shorey, Jr., Chicago, Ill., and Shorey, Gavin & Shorey, Chicago, Ill., for certain defendant.

HOFFMAN, District Judge.

In these consolidated causes the court is asked to determine the validity of the practice of certain Bell System companies in offsetting federal old-age insurance benefits,[1] (referred to hereafter as OASI or Social Security benefits) against the amount of the service pensions paid to retired employees of the Bell System companies. The case has been fully tried to the court without a jury and the parties have filed exhaustive briefs. The facts, for the most part, are undisputed, and the issues are largely legal.

In case No. 51 C 577 the plaintiff, Freeman S. Hurd, is a retired employee of Illinois Bell Telephone Company (Illinois Bell), a defendant together with American Telephone and Telegraph Company (AT & T) and The Bankers Trust Company of New York (Bankers Trust), the trustee of the several pension funds established by AT & T and the other associated and allied companies of the Bell System. The second action, No. 52 C 777, which was subsequently consolidated with the prior suit, was brought by the plaintiffs Harley A. Seybold and Charles E. Kluegel, retired employees of Western Electric Company, Incorporated (Western Electric), and by the plaintiffs Walter S. Young, Milo S. Buck, W. E. Oliver and Archie B. Callender, retired employees of AT & T, against Western Electric, AT & T and Bankers Trust.[2]

The pension plans of the three Bell System defendants were inaugurated at the same time, have been amended at approximately the same times and are in all material respects identical. They will be referred to collectively as the Bell Plan. While each of the plans—entitled "Plan for Employees' Pensions, Disability Benefits and Death Benefits"—contains, as the title indicates, provisions for other types of benefits, only the retirement pension is involved in this case.

The plaintiffs have acknowledged that Bankers Trust, with which each of the

---

1. These payments were officially called "primary insurance benefits" until the 1950 Amendments to the Social Security Act were passed when the term "old-age insurance benefit" was adopted. While "survivors" benefits are not involved in the lawsuit, the abbreviation "OASI" is to be understood as referring to the benefits received by the retired worker himself.

2. Federal jurisdiction is based on 28 U.S. C. § 1331, both actions arising under the Social Security Act and particularly § 207 thereof, 42 U.S.C.A. § 407. While the court, after full consideration has

concluded that the plaintiffs' contentions based on the Social Security Act have no merit, the complaint stated a federal question substantial enough to confer jurisdiction. Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 1951, 341 U.S. 246, 249, 71 S.Ct. 692, 95 L.Ed. 912; Bell v. Hood, 1946, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939. See also, Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148.

The amount in controversy as to each of the seven plaintiffs exceeds $3,000 (Pl. Ex. 1). Diversity of citizenship is also present in the Seybold case, but not in the Hurd case.

Bell System companies has entered into a trust agreement, has fully met its duties under the agreements; and no independent relief is sought against it. Bankers Trust was included as a party so that in the event that the plaintiffs prevail in their action against the Bell System defendants, a recovery might be had from the trust funds. For convenience, the term "defendants" will refer only to the three Bell System defendants unless otherwise indicated.

On January 1, 1913, the Bell System defendants first established a Plan for Employees' Pensions, Disability Benefits and Death Benefits. The Plan provides for the payment of a service pension to employees who retire upon reaching one of several combinations of age and years of service—e.g., 60 years of age and 20 years of service for male employees. The formula for determining the amount of the pension (Section 4) is 1 per cent of the average annual pay for 10 consecutive years multiplied by the number of years of employment. The formula has been the same throughout the history of the Plan. In addition, provision is made for a minimum pension which has been increased over the years and was, from 1949 to 1952, $100 per month after age 65 and $75 per month before 65, both including the amount of Social Security benefits received by the retired employee.[3] From its inception the defendants have provided all the funds required by the pension agreement, and the employees have at no time contributed to the financing of the program. Since 1927 the amounts required to meet the defendants' obligations under the

Plan have been determined by what is called an "actuarial accrual method" (Tr. 221–22). The amount so determined each year is set aside from operating expenses and placed in the trust funds maintained separately by Bankers Trust for each of the defendants.[4] The sums placed in the Pension Fund may not, according to the terms of the trust agreements, be used for any purpose other than the discharge of the companies' pension obligations.

Administration of the Plan within each company is vested in the Employees' Benefit Committee, which is composed of five members appointed by the Board of Directors (Section 3). Representatives of the employees do not serve on the Committee.

Section 10 of the Plan[5] provides that the Benefit Committee, with the consent of the President and subject to the approval of the Board of Directors, may make changes in the Plan, and the Company may terminate the Plan,

"but such changes or termination shall not affect the rights of any employee, without his consent, to any benefit or pension to which he may have previously become entitled hereunder."

It is this section which the defendants rely on as authority for the amendments of the Plan to which the plaintiffs object.

The provisions of the Plan which are at the heart of this controversy are those dealing with the adjustment of company pensions to reflect the receipt of government benefits. Since its inception the Plan has provided for such an adjustment. As amended in 1914,[6]

---

3. The minimum pension was further increased in 1952 (Tr. 225).

4. On December 31, 1927, AT & T entered into an agreement with Bankers Trust (Pl. Ex. 54) under which AT & T paid over, and agreed to continue to pay in such amounts as might be necessary, funds which were to be held by Bankers Trust as trustee for the payment of service pensions. A similar agreement was made by Illinois Bell (Pl. Ex. 54) and Western Electric (Pl. Ex. 26) under the same date. These agreements have been

amended and extended from time to time and are in effect today.

5. In accordance with the practice of the parties throughout the trial, the court will use as section numbers those found in the Plan as it was amended in 1949. Some of these sections bore different numbers in earlier versions of the Plan, but it is less confusing to adopt a single reference number whenever possible.

6. The original (1913) version of Section 8(27) will be referred to later.

the provision read as follows (Section 9 (29) in the 1914 version; hereafter referred to as Section 8(27), the present designation):

"In case any benefit or pension shall be payable under the laws now in force or hereafter enacted of any State or Country to any employee of the Company or his beneficiaries under such laws, the excess only, if any, of the amount prescribed in these Regulations above the amount of such benefit or pension prescribed by law shall be the benefit or pension payable under these Regulations. * * * The amounts payable by the Company under any law as aforesaid, whether paid directly to the employee or his beneficiaries, or to any other persons, or to any company, commission or State, to provide for the payment of such benefits or pensions shall, on approval of the Committee, be chargeable to the Fund."

The term "Fund" as used in this provision referred to the reserve funds maintained by the defendants themselves and not to the trust funds. When the defendants entered into the agreements with Bankers Trust in 1927, establishing separate trust funds, the last sentence of this section was eliminated.

In November 1936, after the passage of the Social Security Act but before it became fully effective, the president of each of the defendant companies sent a written announcement to all employees of that company explaining the effect of the Social Security Act on the Bell Plan. The announcement read as follows:

"No change is contemplated in the Plan on account of the Federal Social Security Act of 1935 except that if the Act shall remain in effect unchanged until 1942, when payment of Government Pensions begins under the Act, it is expected that the provision now in the Plan that all of the pension paid by the Government shall be deducted from pension otherwise payable under the Plan will be changed to provide that only one-half the pension paid by the Government under the Act shall be deducted. In other words, if the Act remains unchanged, the employee retiring on pension after 1941 will receive from the Government and the Company together the equivalent of his or her full pension from the Company plus one-half of the Government pension, which half represents, in effect, what the employee has contributed toward the Government pension through the tax on his or her salary or wages." (Def.Ex. 1, 6, 9).

The Social Security Act Amendments of 1939 advanced the effective date of OASI benefit payments to 1940, and the defendants then amended the Plan in accordance with the announcement of 1936. These were the amendments of January 1, 1940. Section 8(27) was revised only to the extent of adding a phrase at the end of the first sentence so that it read:

"In case any benefit or pension shall be payable under the laws now in force or hereafter enacted of any State or Country to any employee of the Company or his beneficiaries under such laws, the excess only, if any, of the amount prescribed in these Regulations above the amount of such benefit or pension prescribed by law shall be the benefit or pension payable under these Regulations, *except as provided in Paragraph 28 of this Section.*" (Emphasis has been added by the court throughout unless otherwise indicated.)

A new Paragraph 28 was added, which had the effect of limiting the offset to one-half, instead of the full amount, of the Social Security payments to which the employee was entitled under the 1939 Act.

"From the time when a person retired on a service pension under this Plan is entitled to a 'primary insurance benefit' under the 'Social Security Act Amendments of 1939' the amount of his monthly service pension otherwise payable under this

Plan shall be reduced by one-half of said 'primary insurance benefit' subject to the following conditions:

"a) Such adjustment shall begin as soon as such person would become entitled to receive, upon application, said 'primary insurance benefit' solely on the basis of employment included in his 'term of employment' as defined in this Plan.

\* \* \* \* \*

" \* \* \* This Paragraph 28 shall be effective only while the Act entitled 'Social Security Act Amendments of 1939' shall remain in effect unchanged."

In 1946 Section 8(27) was again amended to make it applicable to "any benefit or pension, which the Committee shall determine to be of the *same general character* as a payment provided by the Plan". This is substantially the approach that the defendants had followed from the beginning, and the plaintiffs raise no particular issue about this amendment. In addition, a sentence was added that service pensions under the Plan were not to be reduced by reason of governmental pensions payable on account of military service.

In 1939 it became apparent that Congress would again amend the Social Security laws, among other things increasing the amount of OASI benefits. The defendants, believing that further Social Security revisions would nullify the operation of Section 8(28) of their Plan —which was specifically limited to the duration of the 1939 Social Security Act Amendments—and that full offset of OASI benefits would come into play under Section 8(27), again revised their Plan. As it was thus modified effective November 16, 1949, Section 8(28) read. as follows:

"A benefit or pension payment under this Plan shall be reduced by one-half the amount of any related benefit which the recipient would be

7. The pattern is the same for each of the plaintiffs although there are individual differences depending on the date on

entitled to receive under the Federal Social Security Act, *as in effect at the time the payment is made* \* \*, subject to the following conditions:

"a) No pension shall be adjusted to an extent which brings it below the minimum specified under Paragraph 2(a) of Section 4 in any case to which that minimum applies.

\* \* \*

"c) In the event the Social Security Act is amended to provide for tax contributions which are different in rate as between employer and employees, the adjustment provided for in this Paragraph 28 shall be changed with respect to a benefit or pension granted thereafter by substituting for 'one-half' in the computation of such adjustment the ratio which the Company's rate of tax contribution bears to the combined rate of tax imposed upon employer and employees."

It will be seen that by this amendment the one-half offset was no longer tied to a particular Social Security Act but rather to the Act in effect at the time the pension payment is made.

One final amendment to Section 8(28), which is relevant here only for several limited purposes, was made by the defendants in 1952 after Congress again increased Social Security benefits. Under this revision employees who retired prior to August 31, 1952, were to have their pensions adjusted by one-half of the OASI benefits to which they would be entitled under the Social Security Act as amended in 1950, while those retiring after August 31, 1952, would have their pensions adjusted on the basis of the Act in effect on the date of retirement.

The effect of these various provisions may be illustrated by showing the adjustments made in the service pension of one of the plaintiffs, Freeman S. Hurd.[7]

which the employee became entitled to OASI benefits and the application of the minimum pension provisions of the Plan.

Date of Retirement—
January 1, 1941.[8]

| | |
|---|---|
| Basic Pension (computed according to Section 4 of Plan) | $178.47 |
| OASI Benefits to which entitled, beginning March 1, 1944 | 30.46 |
| One-half of OASI Benefits | 15.23 |
| Adjusted Service Pension, March 1, 1944, to September 1, 1950 | 163.24 |
| Combined Service Pension and OASI Benefits, March 1, 1944, to September 1, 1950 | 193.70 |
| OASI Benefits, September 1, 1950, to August 31, 1952 | 54.60 |
| One-half of OASI Benefits | 27.30 |
| Adjusted Service Pension, September 1, 1950, to August 31, 1952 | 151.17 |
| Combined Service Pension and OASI Benefits, September 1, 1950, to August 31, 1952 | 205.77 |

From this table it can be seen that each increase in Social Security benefits resulted in a decrease in Hurd's Illinois Bell service pension, although his total income was greater with each such increase.

Against the background of these provisions in the Bell Plan, the plaintiffs object to four practices of the defendants which may be summarized as follows:

I (A) Neither Section 8(27) of the Plan, nor any other provision, authorized the defendants to deduct any part of Social Security benefits from the plaintiffs' Bell pensions; and the amendment of 1940 providing for one-half offset is void. (B) If such offset was authorized by the Plan, it is unlawful because it amounts to a transfer of the economic benefits of Social Security payments to the defendants in violation of Section 207 of the Social Security Act, 42 U.S.C.A. § 407.

II (A) Even if the defendants had the authority to make the original Social Security offsets in 1940, the 1949 amendment to the Plan, which further increased the amount of the offset, was void. There is no authority in the Plan to redetermine the amount of a service pension after an employee is retired. (B) This additional adjustment is also contrary to the policy of the Social Security Act.

III The 1952 amendment to the Plan—by which the defendants adopted the principle that the amount of a pension may not be redetermined after retirement, but which they applied only to those retiring after 1952—discriminated against the plaintiffs and others in their position and violated the defendants' fiduciary duty to retired employees.

IV There is no authority in the Plan to justify the defendants' practice of continuing to offset Social Security when the employee takes covered employment and thereby loses his Social Security benefits.

The plaintiffs asked for injunctive relief and for the restoration of all amounts unlawfully deducted from their service pensions by the defendants.

The defendants' answer to the plaintiffs' chief contentions (numbers I and II) is that Section 10 of the Plan authorizes the revision of its provisions so long as the amendment does not affect the rights of any employee, without his consent, to any benefit or pension to which he may have previously become entitled. Neither the 1940 nor the 1949 amendment reduced employees' rights under the Plan, and, in fact, both amounted to a liberalization of the Plan in the employees' favor. The defendants also contend that the decision of the Benefit Committee on "all questions"

8. All of the plaintiffs were retired on various dates between December 1940 and June 1950.

arising in the administration of the Plan is by its terms conclusive if the decision is made in good faith; that this applies to questions of law as well as fact; and that such a provision is held valid and binding. With respect to the Social Security Act the defendants say that this law was not intended to have any effect on private pension plans. On the contrary, Congress anticipated some form of integration with private pensions and in several ways since the advent of Social Security has demonstrated its approval of the offset practice.

Before proceeding to a discussion of the specific issues raised, some comment will be made on what the plaintiffs call "preliminary considerations", certain basic premises which the court must recognize and accept in order to decide this case in the proper framework. By way of background the plaintiffs have described what they deem to be the historical development of the law relating to industrial pensions. They say that while private pensions were once treated as an unenforceable gratuity on the part of the employer, they are now universally regarded as deferred wages which form a part of the employee's contract of employment and are fully enforceable as any other contractual obligation. This new status of pensions has particular significance here, it is said, for it means that this is essentially a wage case, and the reduction of the plaintiffs' pensions by reference to Social Security is a reduction of wages. In interpreting wage contracts courts have always resolved any doubts and ambiguities in favor of the employee, strictly construing the terms of the contract against the employer.

It is by no means clear that the change in the legal status of private pensions has been as complete or universally accepted as the plaintiffs insist. As recently as 1954 an Illinois court held that a "noncontributory pension plan did not give rise to an enforceable unilateral contract". Hughes v. Encyclopaedia Britannica, Inc., 1954, 1 Ill.App.2d 514, 117 N.E.2d 880, 881, 42 A.L.R.2d 456. A similar holding is found in Umshler v. Umshler, 1947, 332 Ill.App. 494, 76 N.E. 2d 231; Dolan v. Heller Bros. Co., 1954, 30 N.J.Super. 440, 104 A.2d 860; Menke v. Thompson, 8 Cir., 1944, 140 F.2d 786; McCabe v. Consolidated Edison Co. of New York, City Ct.N.Y.1941, 30 N.Y.S. 2d 445; Webster v. Southwestern Bell Telephone Co., Tex.Civ.App.1941, 153 S.W.2d 498. The two most clear-cut decisions upholding the enforceability of private pension plans are Schofield v. Zion's Co-op. Mercantile Institution, 1934, 85 Utah 281, 39 P.2d 342, 96 A.L. R. 1083, and Psutka v. Michigan Alkali Co., 1936, 274 Mich. 318, 264 N.W. 385. Neither by the timing of the cases nor by the nature of the particular plan involved (in all it was a noncontributory "voluntary" plan) is it possible satisfactorily to reconcile all of these cases. Apparently the same diversity of view prevails with respect to public pension plans established for governmental employees. See Note, 99 U. of Penn. L. Rev. 701 (1951). A careful reading of the decisions indicates, however, that even the states following a strict view of pension plans would enforce employees' rights in a separately established trust fund; and many other cases can be found in which the court and the parties have assumed that the pension plan creates an enforceable contract obligation. The defendants have conceded as much, for they have not questioned the right of the plaintiffs to enforce the terms of the Bell Plan.

Again, it is not as clear as the plaintiffs contend that a suit to enforce a pension right is in effect a suit to obtain a deferred wage and thus a "wage case". The plaintiffs point to Inland Steel Co. v. N. L. R. B., 7 Cir., 1948, 170 F.2d 247, 12 A.L.R.2d 240, certiorari denied, 1949, 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112, as the "decisive clarification for the whole field of pension law in holding that the contract was one for the payment of a deferred wage." The Inland Steel case clearly held that pensions are a subject of compulsory collective bargaining under the Labor Management Relations

Act. The court concluded that the "better" view was that the benefits of pension plans are included in the term wages, but that in any event they are one of the conditions of employment and thus covered by the Act. See also, Ledwith v. Bankers Life Insurance Co., 1952, 156 Neb. 107, 54 N.W.2d 409, describing retirement benefits as "a form of contingent deferred compensation" for purposes of a state statute regulating the compensation of insurance company employees.

■■ Accepting the view that pensions are deferred wages, however, the court is unable to see in what way that determines the outcome of this case. The instrument upon which the litigation turns is, as both parties admit, a unilateral contract to pay a pension; and the court's duty is to establish the meaning and effect of that contract, guided by applicable principles of interpretation and whatever relevant evidence the parties have introduced that will aid in finding the meaning. Apparently the plaintiffs' concern in labeling this as a "wage" case is the belief that the doctrine of *contra proferentem* will then resolve the issues in their favor. This is one of the guides to the interpretation of a contract, the effect of which is that when there is doubt as to which of several possible meanings is to be given to the words of a contract, the words should be construed most strongly against the party who chose them. The court is not aware of a separate and distinct rule that wage contracts are always strictly construed against the employer. Judicial expressions to this effect can readily be traced to the *contra proferentem* rule. This appears clearly in Western Union Telegraph Co. v. Hughes, 4 Cir., 1915, 228 F. 885, 887–888 a case cited by the plaintiffs. The Western Union case was an action arising under a benefit plan in which the court explicitly adopted "the rule that the words of an insurance policy, being those of the insurance company itself, should be taken most strongly against it".[9] See also, Forrish v. Kennedy, 1954, 377 Pa. 370, 105 A.2d 67; National Symphony Orchestra Ass'n v. Konevsky, Mun.Ct.App.D.C.1945, 44 A. 2d 694. The plaintiffs have relied on this rule as a command to adopt each interpretation of the Bell Plan which they put forward. But it can have no such effect. At best it is a secondary rule of interpretation, a "last resort" which may be invoked after all of the ordinary interpretative guides have been exhausted and there remain two or more reasonable interpretations of the language in question. 3 Corbin, Contracts, § 559 (1951); and see the cases cited in 17 C.J.S., Contracts, § 324.[10] The defect in the plaintiffs' case is that they have applied none of the other principles of interpretation. Rather, they have isolated certain words or phrases and assigned to them a precise meaning which was designed to create ambiguity and then resolved the resulting ambiguity in their own favor. Such a course would not lead to a proper interpretation of the contract. The court has at all times been guided by what it finds to have been the principal purpose of the Bell Plan and particularly of the provisions in issue here and by what the language was intended to mean and known by the plaintiffs to mean. See United States Trust Co. of New York v. Jones, 1953, 414 Ill. 265, 111 N.E.2d 144.

■ As the court understands the second of the plaintiffs' underlying prin-

9. The rule is most frequently applied to insurance policies. Restatement, Contracts § 236(d) (1932), and comment thereon.

10. The Court of Appeals for the Eighth Circuit has specifically rejected the application of the rule to a pension plan on the ground that such a contract "possessed none of the elements of a contract of insurance". Menke v. Thompson, 8 Cir., 1944, 140 F.2d 786, 791. The Supreme Court of Oregon has held the rule inapplicable to the Western Union pension plan. McLemore v. Western Union Telegraph Co., 1918, 88 Or. 228, 171 P. 390, 1049.

ciples, it is that the relationship between the defendants and their retired employees is that of beneficiary and fiduciary. They recite the creation of the trust funds in 1927 under agreement with Bankers Trust and the undertaking which such agreement implied—that the trust funds, corpus and income, could be used only to satisfy the defendants' obligations to their employees under the terms of the trust agreements and the Plan. From this they argue that upon retirement of the plaintiffs the defendants assumed the role of fiduciary with the concomitant strict standards of conduct applicable to trustees. They also say that basically the proceeding is thus one for the interpretation of a trust agreement and the proper application of trust funds. They do not reconcile this with their earlier contention that the proceeding is basically a wage case. It is not questioned that the sums of money required to meet the defendants' obligations under the Plan are in trust and that the funds may be used only for the benefit of the employees. But the court is unable to follow the plaintiffs' reasoning by which they transform the creator of the trust into the trustee. If misconduct were charged against Bankers Trust, the law of trusts would be relevant. But the plaintiffs' rights in relation to the Bell System defendants are contractual.

 The plaintiffs alleged in their complaint that these were class suits and that they were brought on behalf of themselves and all other past and prospective pensioners of Bell System companies whose service pensions have been or would be reduced by reason of OASI benefits. On the record the court believes that the plaintiffs have met the requirements of Rule 23(a) (3) of the Federal Rules of Civil Procedure, 28 U.S.C., and that they were entitled to bring these suits as "spurious" class actions—although the class which the plaintiffs claim to represent is not as broad as the several groups listed in the final amended complaints. The necessary identity of interest would extend only to those employees of AT & T, Illinois Bell and Western Electric who retired prior to September 1, 1950, and whose service pensions had been adjusted upon the receipt of Social Security benefits. No other members of the class, however, intervened in these proceedings;[11] and since Rule 23(a) (3) is a permissive joinder device and only the original parties and intervenors are bound by a judgment in a spurious class action,[12] the court cannot think of any advantage to be gained by the plaintiffs, or the defendants, in calling this a class action under the circumstances. Clearly the determination has no relevance to the merits of the action.

### I (A)

The first of the plaintiffs' principal contentions is that the Bell Plan never contained the authority which the defendants attributed to it to deduct OASI benefits from the companies' service pensions. This argument is made, and will be discussed, in terms of the following specific points:

 1. It is said that the phrase "the excess only, if any, of the amount *prescribed in the Plan* above the amount of such payment pre-

---

11. For the possible effect of this factor on the validity of the class suit, see Oppenheimer v. F. J. Young & Co., 2 Cir., 1944, 144 F.2d 387, 390.

At an earlier stage of these proceedings intervention was sought under Rule 24 by the Bell System Pensioners Association, Inc., and certain individuals as members of that Association. This court (Judge La Buy) denied the petition be-

cause the Association and its membership had no justiciable interest as such in the litigation.

12. Kainz v. Anheuser-Busch, Inc., 7 Cir., 1952, 194 F.2d 737, certiorari denied, 1952, 344 U.S. 820, 73 S.Ct. 17, 97 L. Ed. 638; Shipley v. Pittsburgh & L. E. R. Co., D.C.W.D.Pa.1947, 70 F.Supp. 870; 3 Moore's Federal Practice § 23.10 (2d ed. 1948).

scribed by law shall be *payable under the Plan.*" [13]
is "literally unintelligible" and that Section 8(27) is so vague as to be unenforceable. The plaintiffs argue that the amount "prescribed in the Plan" and the amount "payable under the Plan" are identical and that it reduces the provision to absurdity to subtract a third amount, the government pension, from one of two equals and still assert that they are equal. This assumes that the two phrases express an identical meaning, but there is nothing to indicate that they do. They are not technical terms. One is used to refer to the pension determined by application of the basic formula of the Plan, while the second expresses the effect of Section 8(27) that only the excess of the basic pension, after deduction of any government pension, will actually be paid.

"An interpretation which gives a reasonable, lawful and effective meaning to all manifestations of intention is preferred to an interpretation which leaves a part of such manifestations unreasonable, unlawful or of no effect." Restatement, Contracts § 236(a) (1932).

There is no difficulty in understanding the intended operation of Section 8(27).

■ 2. In further support of the asserted fatal ambiguity of Section 8 (27), the plaintiffs contend that the defendants themselves have been confused about the scope of the provision in particular cases. It is doubtful that an uncertainty about the applicability of the provision in other, and perhaps more difficult, cases would be very persuasive in proving that the section was so ambiguous as to be unenforceable. But, in any event, the evidence does not bear out the plaintiffs' contention. What it does show is that the defendants knew that they had used all-inclusive terms—*i. e.,* that every government benefit or pension

required by law was to be deducted— but, recognizing that in some circumstances the deduction would operate in an unfair or undesirable manner, modified the policy set out in Section 8(27). For example, in connection with state old-age pensions, the Employees' Benefit Committee of AT & T determined that very few employees retired on a company pension would be eligible for state old-age pensions, that the laws were in a process of change and that those so far enacted should not be considered for the present. (Pl. Ex. 84, letter of February 24, 1931). In recommending the 1946 amendment to Section 8(27), specifically excluding military pensions, the Benefit Committees of AT & T and Illinois Bell stated that a "literal interpretation" of the provision required the deduction of any kind of payment provided by law but that in the interest of equity the Committee had endeavored to limit it to payments of the same general character. (Def. Ex. 23, 24). Both the exclusion of military pensions and the limitation to benefits of the same general character were then incorporated into Section 8 (27). Again, in the case of the Rhode Island cash sickness benefits the AT & T Benefit Committee recognized that Section 8(27) required it to deduct these benefits from the disability benefits that would be paid under the Plan but recommended reimbursing the employee because the Rhode Island benefits were provided for solely by employee contributions. (Pl. Ex. 90). This pattern is repeated in Pl. Ex. 88 with respect to Workmen's Compensation payments received by a Bell employee for injuries suffered in outside employment.

■ 3. The plaintiffs next contend that old-age insurance benefits are neither a pension nor a benefit as those terms are used in Section 8(27). It is claimed that OASI payments are, as the name indicates, a form of insurance,

---

13. This wording is taken from the 1949 Plan. The earlier versions, which were in substance the same, read:
"the excess only, if any, of the amount prescribed in these Regulations above

the amount of such benefit or pension prescribed by law shall be the benefit or pension payable under these Regulations."

paid for out of an actuarial fund which is maintained by contributions made in part by the employees. The plaintiffs acknowledge that " 'pension' is sometimes loosely used to refer to any retirement annuity"; but they say that when the very issue is the meaning of the term, it is established in federal jurisprudence that "pension" has an exact meaning which does not include retirement annuities payable by the government out of funds contributed by the beneficiaries. Dismuke v. United States, 1936, 297 U.S. 167, 56 S.Ct. 400, 80 L. Ed. 561, and Lemly v. United States, 1948, 75 F.Supp. 248, 109 Ct.Cl. 760, are relied upon. In both of these cases the courts held that the claim sued upon by the plaintiff was not one for a pension within the meaning of statutes restricting the jurisdiction of federal courts over claims for pensions. In the Dismuke case the Supreme Court was interpreting what it believed Congress meant by the term "pension" when it passed the Tucker Act limiting jurisdiction. In the Lemly case the court was dealing with an act in which Congress separately listed "pensions" and "retirement pay", and it concluded that Congress gave each word an individual meaning. A further examination of the Lemly case shows, however, that under the definitions which the court gave to the two terms, Social Security benefits would seem to qualify as a pension rather than as retirement pay. That these cases do not prescribe an established meaning of the term "pension" for all purposes is more apparent from the decision in Anderson v. United States, 9 Cir., 1953, 205 F.2d 326. The court, at p. 328, observed that the word "pension" "is an ambiguous term at best." It acknowledged that "pension" has been "loosely" defined as a government gratuity; but despite the fact that the claim sued on in the Anderson case rested on a gratuitous allowance, the court nevertheless held that it was not a pension within the meaning of the jurisdictional statutes. The court concluded that prior decisions, including the Dismuke case, meant only that in enacting the jurisdictional limitations Congress intended the term "pension" to refer to gratuitous pensions paid to military veterans. There is no attempt in these cases to settle the meaning in other contexts. But even if "pension", as used in federal statutes, does not ordinarily encompass a contributory retirement scheme (and the Social Security laws do not refer to OASI benefits as a pension), we are not at this stage interpreting the Social Security Act but, rather, the defendants' private pension plan.

The plaintiffs attempt to ascribe to the terms used in Section 8(27) a precise and technical meaning which was never intended and which the words have acquired, if at all, only in recent years and in other contexts. What they ignore is that Section 8(27), in its present form, was drafted in 1914 at a time when the scope and variety of present-day old-age and disability plans were unknown and, indeed, industrial pensions themselves were a rarity. Section 8(27) by its terms was to cover "laws hereafter enacted". There is evidence to show that the provision was "purposely made very broad in order to cover the many possible forms of social insurance, which it is impossible to foresee in detail, but which if enacted would, in the absence of a provision of this sort, result in duplicate payments to employees or their beneficiaries, to which the Company would be forced to contribute either directly * * * or indirectly * * *." (Def. Ex. 33). In 1918 the Secretary of the Employees Benefit Fund Committee of AT & T wrote that, "The wording is broad enough to cover health insurance laws, old age pensions, and similar laws if any such laws are ever enacted in this country." (Def. Ex. 32). Whatever weight these expressions are entitled to (they were intra-company communications), it would be difficult to conceive of a governmental payment which more accurately fulfills the stated purpose of Section 8(27). The court would not be justified in nullifying this provision because the defendants were

unable to describe in detail the social legislation of 20 years hence which—with rather surprising foresight—they anticipated and provided for.

Much of what has been said applies also to the argument that the term "benefit", as used in the Bell Plan, has a precise and technical meaning. The plaintiffs are correct, however, in pointing out that the Plan is generally consistent in referring to the retirement payments as pensions and to the sickness and accident payments as benefits, from which they argue that the two terms are mutually exclusive. If Section 8(27) were confined to the deduction of benefits (instead of benefits *or* pensions, as it provides), this contention would be entitled to serious consideration. On the other hand, it is not accurate to say that the term "benefit" is never used in the Plan in the broader sense which the word connotes. The "Summary of Benefits", which was included in all copies of the Plan distributed to employees, includes a description of the pension provisions as one of the "benefits to which employees may become entitled"; and Sections 8(1) and (2) and 9 speak of benefits in a nonexclusive sense. In addition, the plaintiffs, to be consistent with their earlier argument on the term "pension", would have to acknowledge that Title II of the Social Security Act identifies the OASI payments as benefits.

▇▇ 4. The plaintiffs contend that Social Security benefits could not be offset against company pensions under Section 8(27) because the two are not in *pari materia*—*i. e.*, the Social Security benefit is not the same kind of payment as the Bell service pension. The source of this argument is the defendants' expressed policy that government benefits were intended to be offset only when they are of the same character as the benefit payable under the Plan. (Pl. Ex. 42). This policy was written into the Plan when Section 8(27) was amended in 1946 to apply to "any benefit or pension, which the Committee shall determine to be of the *same general character* as a

payment provided by the Plan". The reason for this policy, as expressed in company statements, is to avoid duplication of payments and costs. Building on this, the plaintiffs argue that the only criterion for determining whether benefits duplicate one another is the identity of the purposes which they serve and that OASI benefits and the private pension do not have the same purpose. Social Security is a "remedy for a general social evil—destitution in old age of retired industrial workers who have been unable to provide retirement income out of their own savings." (Pl. Brief, p. 39). The purpose of an industrial pension, on the other hand, is to obtain a particular business advantage for the company maintaining it, principally in encouraging long service by employees and in promoting efficiency by enabling the company to retire older workers, whose contribution has probably diminished, and thus make room for younger men. There is no quarrel with these characterizations so far as they go. But it seems to the court that the plaintiffs have avoided the fundamental similarities between Social Security and the private pension by concerning themselves only with motivation in a narrow sense which is not justified by the standard of Section 8(27) that the benefits be of "the same general character." Of course, Congress in enacting the Social Security Act directed its attention to broad economic and social problems. Congress does not legislate for the advantage, business or otherwise, of individual companies. The defendants, on the other hand, could hardly justify to their shareholders, or public regulatory agencies, the expenditure of millions of dollars, which each of the plans has cost, if they could point to no business advantage to the companies. The defendants' witness Latimer, who is intimately acquainted both with the development of the Social Security scheme and with a large number of private industrial pension plans, testified on cross-examination in answer to a question as to whether he would

agree that there are differences of a substantive character between an industrial pension and Social Security:

"I am not sure that I know what is meant by 'substantive'.

"I can answer that by saying that to me they are of the same general character. They are not identical, but I am fully convinced that they are of the same general character because of the objectives in common, held by both the Government and the companies, by the character of the person to whom the payment is made, and by and large the general over-all purpose which they serve." (Tr. 403).

Both the Social Security payments and the service pensions granted under the Bell Plan provide retirement income to defendants' employees and both enable the so-called superannuated employees to be retired without becoming public charges and thus make room for the younger members of the labor force.[14] The fact that one is paid for indirectly by the defendants through payroll taxes required by law [15] and the other directly by contributions made to a trust fund does not destroy the similar function they serve for the employer and even more for the employee within the meaning of Section 8(27).

 5. Finally, the plaintiffs say that the defendants have consciously misled their employees for some 20 or 30 years by claiming that Section 8(27) authorized the deduction of *government* pensions when, in fact, as they knew, that section authorized only the deduction of benefits paid under law by the *companies* themselves. In this they rely principally on the language of Section 8

(27) as it appeared (as Section 9(32)) in the original Plan of 1913:

"In case any employee or his beneficiaries shall be entitled under the laws of any State to any compensation, pension or other benefit greater than that herein provided, the amount paid to the employee shall be that prescribed by statute. The Committee are authorized to pay the amount of such liability in the manner prescribed by law instead of in accordance with the provisions contained herein. In case the statutory liability is less than the Company's liability hereunder, the Committee may make the payments required by law and shall pay to such employee or to those persons entitled to take hereunder the excess of the amount payable hereunder above *the amount so paid in accordance with law.* In case any statutory payment has to be made or any judgment is recovered by an employee or his beneficiaries against the Company on account of the legal liability above described or any liability for damages on account of accident or death, or on account of any liability hereunder, the amount of the statutory payment or judgment shall be chargeable to the Fund."

When the section was amended in 1914 to read in substantially its present form, the plaintiffs contend that the intent to deduct only company-paid benefits required by law was continued in the last sentence of the revised provision:

"The amounts payable by the Company under any law as aforesaid, whether paid directly to the employee or his beneficiaries, or to any

---

14. That the effect of Social Security in encouraging the retirement of older workers to make room for younger ones was a recognized purpose of the Social Security Act is seen in the Informational Service Circular No. 3 of the Social Security Board, November 1936:

"Q. 3. What is the purpose of the Federal old-age benefits provisions?

"A. The main purpose is to provide an assured retirement income to wage earners when they have reached the age of 65, thus making possible the retirement of these older workers from regular employment and also increasing opportunities for employment and advancement of younger workers."

15. In this connection it is interesting to note that the defendants offset only that part of a worker's OASI benefit which is based on wages paid to him by the Bell System companies.

other person, or to any company, commission or State, to provide for the payment of such benefits or pensions shall, on approval of the Committee, be chargeable to the Fund."

The precise argument made by the plaintiffs with respect to Section 9(32) of the 1913 Plan was considered and rejected by the Supreme Court of Oregon in McLemore v. Western Union Telegraph Co., 1918, 88 Or. 228, 171 P. 390, modified on other grounds, 171 P. 1049. In that case the court was asked to hold that a benefit payment made to plaintiff by the State of Oregon for the death of her husband was not within the scope of the identical Section 9(32) of Western Union's Plan because the payment had been made by the state and not by the employer.

"We are not favorably impressed with this contention. The fund from which the state makes payments under the act of 1913 is supplied chiefly by contributions made by employers of labor. Most of the payments made to the employés and their beneficiaries are made indirectly by the employers. Giving to the plan the fair construction to which it is entitled, an intention is manifested that it shall be read in the light of the laws of the state in which the employé resides and in which he is injured. * * * At the time when the defendant promulgated its scheme the Oregon statute had not been enacted. The author of the plan was evidently familiar only with compensation laws which provided for payments by the employer directly to the employé. The intention is nevertheless apparent from the language used in section 32 of article 9, and it should be given effect as above stated." 171 P. at page 394.

The court sees no reason to disturb this decision which was certainly fair notice that the Bell Plan was not confined to benefits paid directly by the companies.

As for the last sentence of the provision as it appeared in the Plan from 1914 to 1928, the court believes that it clearly meant that the amounts which the companies might be required to pay either directly to the employees or indirectly in the form of taxes or other assessments could be charged to the Benefit Fund, which was at that time a bookkeeping account. This is consistent with the elimination of that sentence in 1928 when the defendants changed to a trust fund method of segregating the amounts required to meet their obligations. The company "expositions" relied upon by the plaintiffs as proof of their interpretation (Pl. Ex. 89, 92) were fully answered in Def. Ex. 33 and 34 by the Benefit Committee of AT & T.

The court has given careful consideration to each of the points made by the plaintiffs on this aspect of the case and has concluded that neither singly nor together are they persuasive. There is, in addition, another weakness underlying the plaintiffs' entire attack on the validity of offsetting Social Security benefits under the terms of the Bell Plan. At least as early as 1936 the defendants set forth their interpretation of Section 8 (27) in the announcement admittedly sent to all employees (quoted supra 136 F.Supp. 130) explaining the effect of the Social Security Act on the Bell Plan.[16] This interpretation was acted on in 1940 when the defendants amended the Plan to provide for the deduction of only one-half of Social Security benefits. The defendants have continuously made the offset since then, and the plaintiffs accepted their reduced pension checks for some 11 years without objection so far as this record shows.[17] Not until the filing of

16. The announcement was repeated in several company magazines and in more detailed explanations to supervisory employees. Def. Ex. 2, 5, 7, 8, 10.

17. In fact, the plaintiff Hurd, while disagreeing with certain details, accepted

the principle that "the company has a right to recover its one per cent contribution to the social security plan". Def. Ex. 30, letter dated March 20, 1945, to vice-president of Illinois Bell.

Hurd's first amended complaint in 1951 was the issue suggested. It is an accepted principle of contract law that an interpretation given to the agreement by one party and concurred in by the other may be accorded great weight by the court in arriving at the meaning which it adopts. See 3 Corbin, Contracts § 558 (1951), and the many cases cited there; Restatement, Contracts § 231(e) (1932). Particularly apt is Judge Learned Hand's opinion in Nolte v. Hudson Navigation Co., 2 Cir., 1926, 16 F.2d 182. The question was whether the city of New York could claim compensation for a shed, located near the company's pier, which the company had occupied for some years without paying rent. Judge Hand, in disallowing the claim, said with respect to the contract between the parties relating to the occupancy of the pier:

"* * * True, there is no apt language to include the maintenance of a shed upon the land inside the bulkhead; but there is equally none to exclude it. 'Emoluments' 'appurtenant' to the wharf is indeed a vague phrase, and was used because it was; the exact extent of what was granted was not known, and was not meant to be set out in detail. * * *

"However, we need not say that, if the words stood bare, as they did in 1898, we should feel obliged to construe them in this way. At least, when parties choose such equivocal language, they must be content with the interpretation which they put upon it immediately thereafter, and to which they continuously adhered for nearly 25 years. While the new pier and bulkhead were building, the company asserted its right under the contract to a new shed located relatively to the new bulkhead as the old shed was located relatively to the old bulkhead, and the city assented, not as the grant of a new right, but as something included within the old.

"Nobody read any other meaning into the words until this claim was filed, and everybody concerned acted on the assumption that the first interpretation had been right. The canon of contemporaneous and subsequent construction of a contract applies, not only to individuals, but also to municipalities * * *." 16 F.2d at page 184.

■ The court therefore concludes that the Bell Plan has from its inception provided for the offset of a government benefit like Social Security and that the 1940 amendment calling for a one-half offset did not reduce any rights of the plaintiffs.

### I (B)

■ The second ground on which the plaintiffs claim that the offset of Social Security benefits from company pensions is invalid is that it constitutes a transfer prohibited by Section 207 of the Social Security Act, 42 U.S.C.A. § 407. This section provides:

"The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law."

The plaintiffs' argument is summarized as follows:

"* * * where the receipt of the Social Security payment is made the sole legal ground for the reduction *pro tanto* in the amount of a deferred wage which, but for such receipt, would otherwise be due, there is a corresponding shift in the economic benefit of the Social Security payment, and therefore a transfer under Sec. 407." (Pl. Brief, p. 51).

Additional evidence of this "shift in economic benefit" is said to be apparent from the fact that the operation of the

offset provision decreased both the amount of accrual and the rate of accrual of each of the defendants.[18] In other words, after Social Security the defendants were able to reduce their financial obligations under the Plan. It is conceded that the plaintiffs' service pensions were reduced after the passage of the Social Security Act and that the defendants' obligations were also reduced by reason of its enactment.

The court cannot accept the plaintiffs' interpretation of Section 207 of the Social Security Act. The language used and the context both indicate that the provision was directed at the ordinary type of transfer or assignment such as a wage assignment. The section may well have been a statutory enactment of a rule of law commonly followed that government pensions are not assignable. See 4 Corbin, Contracts § 857, 6 *id.* § 1427 (1951). The only cases decided under Section 407 have involved problems of the transfer of rights by operation of law to a deceased wage-earner's estate. See Gardner v. Ewing, D.C.S.D. Ohio 1950, 88 F.Supp. 315, affirmed, 6 Cir., 1950, 185 F.2d 781, reversed as to taxation of costs, 1951, 341 U.S. 321, 71 S.Ct. 684, 95 L.Ed. 968; Beers v. Federal Security Administrator, 2 Cir., 1949, 172 F.2d 34; cf. Anderson v. United States, 9 Cir., 1953, 205 F.2d 326. In the Gardner case the district court said:

> "In using the words 'transferable or assignable' in Section 207 of the Social Security Act * * * Congress intended to prohibit voluntary alienation by the wage-earner,

nothing more." 88 F.Supp. at page 323.

As the plaintiffs admit, the application of the defendants' offset provisions in no way affects their right to OASI benefits. They continue to receive the full government check to which they are entitled under the Act. It is in calculating the service pension that the defendants take into account one-half of the OASI allowance. But Section 207 was never intended to freeze a worker's private pension at a particular level. It was concerned only with guaranteeing that the worker would actually receive for his own use the amount due him under the Social Security Act.

Moreover, the offset practice cannot be said to violate some broader policy of the Social Security Act. There is nothing in the Social Security Act or in its legislative history to show that Congress intended to establish standards of validity or invalidity for private pension plans. What little does appear in the legislative history indicates, contrary to the plaintiffs' position, that some form of integration was a hoped-for aftermath of the federal program. Some members of Congress expressed a fear that the new act might lead to the abandonment of more generous private programs, and they were reassured by Senate leaders of the Social Security legislation that there was nothing in the bill to prevent such companies from considering the federal program as a minimum and continuing to pay their employees an additional retirement income. 79 Cong.Rec. 9273, 9529, 9533, 9535 (1935).[19] In fact,

---

18. Actually, both the yearly amount of accrual and the rate of accrual have increased considerably since 1936 with some fluctuations during that period (Def. Ex. 44, Tr. 225–26). These increases are due to other factors such as changes in interest rates, mortality rates, increases in the minimum pension, differences in wage levels, number of employees, etc. As the chief actuary of AT & T testified, however, the offsetting of OASI benefits reduced the pension accruals and the rate of accrual below what they would have been without Social Security deductions (Tr. 248, 261).

19. Some of the comments were made in connection with the so-called Clark Amendment, which would have exempted employers whose private plans met certain standards from the federal program. While the rejection of the amendment would seem to support the impression that Congress did not intend to legislate as to private plans, in the absence of a definitive explanation of the amendment's defeat the court has given no weight to it.

offset was suggested by name during the hearings on the proposed legislation. Dr. J. Douglas Brown, a member of the professional staff of the President's Committee on Economic Security, which developed the Social Security program, and a specialist in the problems of old-age security, testified before the House Ways and Means Committee:

"This particular program incorporated in the bill acts as a basic pension protection. It does not go anywhere near as high as some private pension plans, particularly in the case of higher paid employees.

"This is a social-insurance annuity program, not a private annuity program, so that all of these more progressive companies who already have pension plans can merely permit this protection to offset the lower level of protection they are already affording and then go beyond it if they are so inclined.

\* \* \* \* \* \*

" \* \* \* Suppose a man's contribution plus his employer's contribution entitled him to $75 under this plan, and he were a higher-paid employee, say entitled to $100 under the former company plan, the company would make certain provisions that whatever the Federal annuity plan provided would be offset against their obligation under the private plan." [20]

The total absence of any reference to private pension plans, in the light of these expressions, leaves no doubt that Congress did not intend the Social Security Act to be the legal cause of invalidating a private plan that was integrated with the federal program.

This is further confirmed in the reports of hearings relating to the 1939 Amendments to the Social Security Act.

By this time a number of companies with private pension plans had effected an integration of their own benefits with the federal program. Congress was fully informed of this practice by the chairman of the Social Security Board, members of the Advisory Council on Social Security and others who had first-hand experience with integrated schemes. Dr. Arthur Altmeyer, Chairman of the Social Security Board, for example, testified:

" \* \* \* The private pension plan must adapt itself to the basic old-age insurance plan, and practically all of them have done so. The private pension plans that were in existence have adapted themselves, so they are superimposed on the basic Federal old-age insurance system. There have also been a great many new ones that have been set up that have done so." [21]

And in commenting on a FCC report suggesting that Bell System companies should consider reducing pensions by the full amount of Social Security benefits or discontinuing their plan altogether, Dr. Altmeyer said:

" \* \* \* Certainly the Social Security Board would be very reluctant and unhappy to see the Bell Telephone Co. or any other employer reduce the net or the overall protection to its employees, counting in both the benefits from the old-age system and the benefits under their own system." [22]

Similar comments or disclosures of integrated pension plans are found in Hearings before House Committee on Ways and Means relative to Social Security Act Amendments of 1939, 76th Cong., 1st Sess. 1089, 1096–97, 1109–10, 1117, 1156, 1161 (1939); Hearings before Senate Finance Committee on H. R. 6635, 76th Cong., 1st Sess. 169 (1939).

20. Hearings before House Committee on Ways and Means on H.R. 4120, 74th Cong., 1st Sess. 251 (1935).

21. Hearings before Senate Finance Committee on H.R. 6635, 76th Cong., 1st Sess. 21 (1939).

22. Hearings before House Committee on Ways and Means Relative to Social Security Act Amendments of 1939, 76th Cong., 1st Sess. 2182 (1939).

No provision was added to the 1939 Amendments, however, to express Congressional disapproval of this practice.

## II (A)

The plaintiffs' second principal ground of attack is directed against the 1949 amendment to the Plan. In 1940, when the effective date of the Social Security Act was advanced, the defendants amended the Plan in accordance with the announcement of 1936 to all employees to provide for a one-half offset of OASI benefits instead of the full offset which the Plan authorized. Section 8(28), which incorporated the one-half offset principle, specifically provided that it "shall be effective only while the Act entitled 'Social Security Act Amendments of 1939' shall remain in effect unchanged." This provision limited the one-half offset to the life of the 1939 Act. If the Act were subsequently amended or repealed, it was the defendants' view that this section would lapse and the full offset required by Section 8(27) would again come into force until the Plan might again be amended.[23] Def. Ex. 13, 17, 21 (Questions and Answers for Supervisory Employees, November 1939); Def. Ex. 22 (letter of October 17, 1939, to all associated company presidents from vice-president of AT & T). The plaintiffs concede that this was the effect of the 1940 amendment, and, indeed, it is the only reasonable interpretation of that amendment. But, they say, the lapse and restoration of full offset was limited to employees retiring thereafter and could not be applied to those already retired. A service pension irrevocably vests in an employee on the date of his retirement and can never be redetermined after his retirement; and the plaintiffs' pensions, once determined on the basis of the 1939 Act, could not be readjusted to reflect the 1950 Act. It is clear that unless the defendants were somehow prohibited from making any adjustment in the plaintiffs' pensions after their retirement, the 1949 amendment to the Plan was valid as to them since it continued the one-half offset instead of permitting full offset to come into play.

In their insistence upon the concept of vested rights, the plaintiffs have overlooked the nature of the right which became vested in the plaintiffs when they fulfilled all the requirements for a pension and were retired. It was not an irrevocable right to a specific sum of money, but a right to receive a pension determined in accordance with the provisions of the Plan. It cannot be argued that the plaintiffs are any less bound by the express terms of the contract than are the defendants.

> "* * * Whatever rights were acquired by the pensioners in this case were acquired under the rules." Cowles v. Morris & Co., 1928, 330 Ill. 11, 21, 161 N.E. 150, 154.

In Menke v. Thompson, 8 Cir., 1944, 140 F.2d 786, 791, the court held that even if the offer of a pension in that case did result in a binding contract, the employee "must be held to have accepted the offer subject to its express conditions." And if one of those conditions is that upon the happening of certain contingencies the pension will be modified or reduced after retirement, it is a valid and binding provision.[24] In Casserly v. City of Oakland, 1936, 6 Cal.2d 64, 56 P.2d 237,

23. The 1949 amendment to the Plan was added to avoid this result. Instead of relating the offset provision to a particular Social Security Act, the new Section 8(28) called for reduction of one-half the benefit "which the recipient would be entitled to receive under the Federal Social Security Act, as in effect at the time the payment is made". This amendment had no effect on the pensions received until the 1950 Amendments to the Social Security Act became effective.

24. Section 8(27) is not the only provision of the Bell Plan which affects the pension of a retired employee. Section 4 (5) provides for the suspension of payments to a retired employee who takes regular employment with a Bell System company; and Section 4(6) provides for a proportionate reduction in the pension of a retired officer who takes any outside employment.

the plaintiffs, former police and fire employees of the city, had been retired on a pension " 'equal to one-half of the salary attached to the rank held' ". Subsequently the city reduced the salaries of police and fire men and the plaintiffs' pensions, which were geared to the salary, were also reduced. The plaintiffs contended that their right to a pension became vested and that there could be no reduction in the amount of the original award (although it could be revised upwards). In rejecting the plaintiffs' position and holding that they had a vested right to a pension but not to a specific amount, the court said:

> "Authorities involving a fixed sum of money are not in point, nor can it be argued that there was an abrogation of contractual rights, any more than it may be argued that the reduction in pay of the active officer is a violation of his contract. The reduction in the amount of the pension is in strict accord with the compensation agreement." 56 P.2d at page 239.

To the same effect, see Jacobus v. Massachusetts Mutual Life Ins. Co., D.C.W. D.N.Y.1950, 91 F.Supp. 674; Brennan v. McCoy, D.C.N.D.W.Va.1940, 34 F. Supp. 865; Fay v. O'Brien, Sup.Ct.1949, 195 Misc. 865, 91 N.Y.S.2d 137, affirmed 1950, 300 N.Y. 750, 92 N.E.2d 457; Aitken v. Roche, 1920, 48 Cal.App. 753, 192 P. 464. The case of Schofield v. Zion's Co-op. Mercantile Institution, 1934, 85 Utah 281, 39 P.2d 342, 343, 96 A.L.R. 1083, which the plaintiffs urge as decisive of this issue, presented a very different situation. In that case the defendant employer's pension plan provided for the retirement of employees who met certain conditions of age and service. The formula for determining the amount of the pension (which was similar to that of the Bell Plan) was set out in the plan which also provided that, " 'The amount of pension to which an employee is entitled at 65 shall be the amount paid him when he actually does retire.' " In addition, there was a provision reserving to the Board of Directors the right

" 'to change the basis of pension allowances by increasing or reducing the same * * *.' " The court interpreted this reservation of power to mean that the Board could revise the pension base at any time before the employee retired but said that it had no application to a retired pensioner whose pension had already been fixed. This was an attempt by the employer to reserve to itself the power, in effect, to ignore the provisions of the plan for computing and awarding pensions and without any guiding standards to fix an amount after the retirement of an employee which it then decided it could pay to him. The court's interpretation, which prevented the plan from being a worthless offer, was undoubtedly justified under the circumstances. The defendants in this case have not changed or ignored the formula set forth in the Plan for determining the amount of the pension. The adjustment of which the plaintiffs complain was made in accordance with fixed standards which were at all times clearly incorporated in the Plan. Moreover, it should be remembered that the plaintiffs' total retirement income was increased, not reduced, after each increase in Social Security benefits.

■ Granting the validity of a provision calling for adjustment of a pension after retirement in accordance with specified standards, did the Bell Plan contain the authority to adjust the service pensions of retired employees to reflect a government benefit to which they subsequently became entitled? The court believes that it did.

Section 8(27) has from its inception been couched in terms of prospective effect.

> "In case *any* benefit or pension *shall be payable* under the laws now in force or *hereafter enacted* * * to *any* employee * * * the excess only · * * * *shall be* the benefit or pension payable under these Regulations * * *."

By its terms the deduction is to occur whenever a government benefit becomes

payable. Nothing in Section 8(27) supports an intended distinction between active and retired employees, and there would seem to be good reason for this in a provision that was broadly written to cover unknown future contingencies. The provision might well operate unfairly if one group of employees receiving a government pension were to have the entire amount deducted while a second group who receive the same government benefit but who retired shortly before the statute granting it was enacted would continue to receive the full service pension plus the government pension. The failure of Section 8(27) explicitly to say that the defendants have the authority to recalculate the amount of an employee's pension after retirement is not significant. The provision is not written in terms of the time when the calculation is to be made in relation to the employee's status. Rather, it describes the amount of pension or benefit actually to be paid by the company whenever in the future the employee also becomes entitled to a government pension or benefit.

The use of the word "employee" in Section 8(27)—"In case any benefit or pension shall be payable * * * to any *employee* of the Company"—is cited as proof of the fact that the defendants intended that "only a government pension payable to the employee at the time of his retirement, while he is still an employee, is subject to offset." (Pl. Reply Brief, p. 33). A retired pensioner, it is said, cannot be an employee, Schofield v. Zion's Co-Op. Mercantile Institution, 1934, 85 Utah 281, 39 P.2d 342; and the definition of "employee" in the Bell Plan confirms this. But the Social Security Pension is seldom payable to Bell employees at the time of retirement. Most of them—including a majority of these plaintiffs—retire before the age of 65 so that the reduction in their service pension because of OASI benefits does not begin until, in some cases, several years after retirement. While the plaintiffs, all of whom retired after the passage of the Social Security Act, received a letter upon retirement referring to the adjusted pension they would receive upon reaching 65, there was nevertheless a gap between the date of retirement and the date on which the pension was reduced in the case of those who retired before 65. The amount of OASI benefit stated in the letter would not be conclusive if the employee through an error in calculation or a revision in the law never became entitled to receive that amount.

From a reading of the Plan as a whole, it is apparent that "employee" is used in Section 8(27) to designate those persons who are eligible for benefits or pensions under the Bell Plan, and this is also the function that the definition of "employees" in Section 2(5) serves. ("The word 'Employees' shall mean those persons who receive a regular and stated compensation from the Company other than a pension or retainer.") The Plan of course recognizes a distinction between an active employee and a "pensioner". A person who is in retirement, for example, cannot receive an accident disability benefit, and different provisions are made for death benefits in his case. When it is necessary to point out these differences in treatment, the Plan does this by referring to an employee or pensioner, as the case may be. But the frequent use of the term "retired employee" in Section 4, the basic pension provision, shows that the defendants recognized the existence of two classes of employees—active and retired.

Moreover, there are at least two other sections of the Plan where the word "employee" appears in a context which, like Section 8(27), leaves no doubt that it was intended to include retired employees. In Section 1 is the Company's undertaking to pay definite amounts to its employees "when they are disabled by accident or sickness or when they are retired from service". Clearly this obligation extends into the period of an employee's retirement and does not end when the company announces the award of a pension at the date of his retirement. Section 10 authorizes the amend-

ment or termination of the Plan so long as "such changes or termination shall not affect the rights of any employee, without his consent, to any benefit or pension to which he may have previously become entitled hereunder." While the plaintiffs no longer rely on this guarantee,[25] Section 10 incorporates the defendants' assurances that no benefit under the Plan—whether a disability payment before retirement or a pension after retirement—will arbitrarily be taken away. Section 8(1) again must include both active and retired employees when it provides that in the event of termination, no employee shall have any right in the Pension Fund or against the company except as provided in the Plan. It is the retired employees whose rights in the Fund have accrued. The use of "employee" as an inclusive term is consistent with the scope of Section 8(27). By its terms it is comprehensive and prospective in effect and includes the deduction of government payments from any benefit—sickness, accident, death, or retirement—that the employee might be entitled to receive under the Plan.

The plaintiffs also rely on the obligation assumed by each of the defendants in Section 1 of the Plan "to provide for the payment of *definite* amounts to its employees" by way of accident or sickness or retirement benefits. But this undertaking is qualified by the phrase "in accordance with these Regulations". The defendants have not provided for the payment of discretionary or varying amounts. The only variation is brought about "in accordance with these Regulations" by deduction of the amount of government benefit to which the employee is entitled. The employee who is disabled by an accident receives full pay (also a "definite" amount although the dollars and cents value *may change from time to time*) for the first thirteen weeks less whatever government benefit he might receive for the injury during that period. If the government benefit should increase or decrease after his disability, the company benefit would be adjusted, and the same is true in the case of pensions. The sum is not irrevocably fixed but it has "distinct or certain limits".[26]

Other arguments advanced in support of the plaintiffs' proposition that the Plan shows on its face that only one determination of the plaintiffs' pension was to be made at the time of retirement require little comment. The occasional reference to the "grant" of a retirement pension does not convert a Plan for Employees' Pensions into a conveyance of property. Nor did the act of retirement and the receipt by the plaintiffs of a letter informing them of their pension constitute a "closing transaction" and an "account stated". These concepts have no applicability to an action seeking to interpret and enforce a pension plan for all employees.

"An account stated is an agreement between parties who have had previous transactions of a monetary character, that all the items of the accounts representing such transactions are true and that the balance struck is correct, together with a promise, express or implied, for the payment of such balance. * * * An account stated is in the nature of a new promise or undertaking, and raises a new cause of action between the parties." Dorsey v. Reconstruction Finance Corp., D.C.N.D.Ill.1951, 101 F.Supp. 197, 200, affirmed, 7 Cir., 1952, 197 F.2d 468.

It would, indeed, be startling if the court were to agree with the plaintiffs at this stage that their action is founded on an account stated and that the terms of the Bell Plan are irrelevant. These parties

---

25. In their reply brief the plaintiffs say that the reference in the two complaints to a violation of Section 10 was a mistake and they have withdrawn their reliance on that section. They are of course free to do this, but it does not

erase the relevancy of the language used in Section 10.

26. As the defendants point out, Def. Brief, p. 36, this is a primary meaning of "definite".

have had no previous commercial transactions in the ordinary sense, and there are no items of account or past transactions upon which a balance could be struck. Moreover, the letter which each of the plaintiffs received at retirement referred to the offset of Social Security benefits "as provided in Section 8, Paragraph 28" (Pl. Ex. 15, 35, 42, 62, 67, 73, 78), so that even in the statement of "account" the provisions of the Plan were incorporated by reference.

Finally, there is no legal significance in the adoption of the amendment to Section 8(28) in 1952. It is the plaintiffs' position that by amending the offset provisions in 1952 to provide that as to employees retiring thereafter the one-half offset would be based on the Social Security Act in effect on the date of retirement, the defendants accepted the principle of an employee's vested right to a specific pension sum as of his retirement date. As the court has pointed out previously, however, there is no rule of law which prevents an employer from adjusting pension payments after retirement in accordance with fixed and reasonable standards. Since the Bell Plan contained such a provision and since the plaintiffs have always received pension payments in accordance with the terms of the Plan in effect at the time of their retirement (or a liberalization thereof), the subsequent amendment cannot be cited as legal authority to enlarge their rights under the Plan.

## II (B)

The 1949 amendment to the Bell Plan, which had the effect of increasing the amount of offset, is also said to violate the Social Security Act. In addition to the grounds previously disposed of by the court, the plaintiffs contend that the increase in the amount of offset following an increase in statutory OASI benefits restricts the power of Congress to augment the retirement income of Social Security beneficiaries and is therefore unlawful.

There is no question but that a private pension plan integrated as the Bell Plan is with OASI benefits absorbs all or a part of the increases which Congress votes in the government benefit. Since one purpose of the increases is to compensate for the rising cost of living —that is, to help maintain at an even level the value of the retired worker's income—in a sense the offset device might be thought to violate the spirit of the Social Security laws. There is no evidence, however, that Congress adopted such an attitude toward offset. The OASI benefits are essentially a minimum, an amount that Congress has set to assure that every worker covered by the Act will have a safety-valve against destitution in old-age. Congress has not legislated on the general subject of retirement income but has merely established an amount that must be available to all who qualify for it. As was true with the earlier Acts, no provision of the Social Security Act Amendments of 1950 refers to this broader subject or to private pension plans. The legislative materials again confirm that Congress was fully aware of integrated private pensions. One member of the House Ways and Means Committee, using AT & T as an example, described the offset of Social Security benefits from company pension awards and questioned whether that was a good practice. The reply from Professor Sumner Slichter, who was testifying at the time, was that there should not be a law on it and that "the parties make their own bargain". Hearings before the House Committee on Ways and Means on H.R. 2893, 81st Cong., 1st Sess. 1539–40 (1949). Marion Folsom, a member of the Advisory Committee on the 1950 Amendments, shared the view that Congress should not legislate as to supplementary pension plans, and Senator Milliken doubted that "we can legislate on the private subject at all." Hearings before Senate Finance Committee on H.R. 6000, 81st Cong., 2d Sess. 512 (1950). In a memorandum prepared by Wilbur Cohen, technical advisor to the

Commissioner for Social Security, and submitted to the Senate Finance Committee, it was stated:

"Benefit formulas in private retirement plans generally make some allowance for the old-age insurance benefit under the Social Security Act. This is usually done in one of two ways:

\* \* \* \* \* \*

"B. Deduction of the full or part of the amount of the social-security benefit from the amount of the benefit resulting from the benefit formula under the private plans.

"As of December 31, 1949, our files show at least 1,963,000 out of approximately 7,000,000 employees are covered under plans of the specific deduction type (B above)." Hearings before Senate Finance Committee on H.R. 6000, 81st Cong., 1st Sess. 509 (1950).

Finally, and of particular significance here, is the statement of the Senate committee which reported the 1950 Amendments acknowledging that the bill did not deal with the problem of private pension plans:

"Another question which is not resolved by this bill but which will be a matter of increasing importance is the relationship of the public social-security program to private pension plans, particularly those now being established through collective bargaining to cover major groups of industrial workers." Sen. Rep. No. 1669, 81st Cong., 2d Sess. 2 (1950).

In the face of the continuous knowledge on the part of members of Congress and the administrators of the Social Security program that a substantial number of large employers utilized the offset device, the silence of the Act on this subject cannot be interpreted as a command to invalidate such provisions in private pension plans. Indeed, we have no evidence that Congress would condemn the practice if it chose to legislate on the subject.

These views make it unnecessary to consider whether the favorable tax treatment accorded integrated private pension plans, including the Bell Plan, constitutes an affirmative Congressional approval of offset provisions, as the defendants contend.

### III

In 1952 the defendants again amended Section 8(28) of the Plan to read as follows:

"A benefit or pension payment under this Plan shall be reduced by one-half the amount of any related benefit which the recipient would be entitled to receive under the Federal Social Security Act, as in effect at the time the payment is made \* \* \*, subject to the following conditions:

"a) A service pension, determined under Section 4, whether in a specified minimum or other amount, shall be adjusted by one-half the amount of the old-age insurance benefit to which a person would be entitled by reason of his above-described employment and wages (1) under the Federal Social Security Act, as amended in 1950 in the case of a person retired on or before August 31, 1952, and (2) under the Federal Social Security Act as in effect on the date of his retirement in the case of a person retiring after August 31, 1952; provided, however, that such adjustment shall not exceed the amount of adjustment, as so computed, under the Federal Social Security Act as in effect at the time the service pension payment is made."

The plaintiffs contend that this amendment violated the defendants' fiduciary duty by discriminating against them. The effect of the amendment was to freeze the amount of offset to be deducted from the plaintiffs' pensions to one-half that of the OASI benefits under the 1950 Act, while employees retiring after 1952 would be subject to one-half the benefits provided by the Act in effect on the date of retirement.

The trust instruments and the pension plan which they incorporate unquestionably created a trust fund, but the trustee is the defendant Bankers Trust and not the Bell System defendants. Their duties to the plaintiffs and all their employees are contractual and are governed by the terms of the Bell Plan. The principles of trust law setting the standards of conduct for trustees are inappropriate here. In some circumstances the powers of control reserved by the settlor of a trust are said to be held in a fiduciary capacity. See 2 Scott, The Law of Trusts § 185, at pp. 975–76 (1939). This might have some bearing on the defendants' reserved powers to control the administration of the trust fund by the trustee, but it does not affect the power reserved by the settlor to amend the terms of his "trust" even if the result should be an increase in the rights of some beneficiaries.

Moreover, the immediate effect of the 1952 amendment was to enlarge, rather than diminish, the plaintiffs' rights under the Plan. Under the provisions of Sections 8(27) and 8(28), as they operated prior to the 1952 amendment, the amount to be deducted from the plaintiffs' pension payments was one-half of the OASI benefits at the time payment was made. This would have resulted in a further reduction of the plaintiffs' service pensions in 1952 and again in 1954 when Social Security benefits were increased. The 1952 amendment to the Plan avoided this result by freezing the amount of the plaintiffs' offset at the 1950 level. Employees retiring after that date, however, are subject to a greater reduction in service pensions resulting from the subsequent increases in Social Security benefits. Considered in this light the revision of Section 8(28) favored the plaintiffs while later-retired employees must assume the risk, if it may be called that, of constantly increasing federal benefits.

■■ It is true, however, that as to employees retiring after 1952 the amendment in question fixes the date of retirement as the final date for determining the amount of offset without reaching back to recompute the plaintiffs' pensions on the same basis. Assuming that this is a liberalizing amendment, as the plaintiffs claim, the only issue would seem to be whether it is unlawful for the defendants to liberalize their plan without applying the new terms retroactively and in the future to employees already retired. That they may do this seems to follow from the decision in Sessions v. Southern California Edison Co., 1941, 47 Cal.App.2d 611, 118 P.2d 935. While the circumstances in that case were not precisely the same, the holding was that the defendant employer was not required to apply the more generous provisions of a revised pension plan equally to all of its retired employees.

"* * * Incidentally, it may be said that it is one thing to be obligated to pay a pension pursuant to a plan under which an employee has retired; it is quite another thing to assume that a company may not subsequently single out such pensioners as it chooses from a class and gratuitously pay them a larger pension from its own corporate funds." 118 P.2d at page 941.

This court would be reluctant to impose an inflexible rule that an employer may not adopt more advantageous pension rules for employees who have not yet retired without at the same time extending the full benefit of those provisions to employees already retired. Certainly it would be more desirable for all to enjoy the same benefits. But to tell an employer that, whatever the costs to be incurred, he may not draw a line might well discourage him from advancing an increase in certain types of benefits. The judgment should, in any event, be that of the parties, not of the court.

### IV

■■ Two of the plaintiffs worked in outside positions for short periods after their retirement. Hurd was employed from October 2, 1944, to October

30, 1945 (Pl. Ex. 101); and Kluegel, from November 13, 1951, to January 15, 1952 (Pl. Ex. 102). Under the terms of Section 203 of the Social Security Act, 42 U.S.C.A. § 403(b) (1), the wages received were deducted from their OASI benefits, and these plaintiffs did not receive any federal payments during the period of covered employment. The defendants (Illinois Bell as to Hurd, and Western Electric as to Kluegel) continued to offset one-half of their Social Security benefits during this period, and the plaintiffs contend that this was improper under the terms of the Plan.

The parties disagree as to which provision of the Plan, Section 8(27) or 8(28), is crucial in determining the validity of the continued offset during periods of covered employment, the defendants contending that it turns on the meaning of 8(28) and the plaintiffs, that 8(27) governs. It is the court's view that Section 8(27) is important only in setting limits on the kind of deduction that might be made while Section 8(28) is the provision directly in issue. In the guise of implementing or liberalizing Section 8(27), the defendants could not add an amendment which clearly contradicted the power reserved in that section. But, as the court has pointed out previously, Section 8(27) was not drafted with a single type of government benefit in mind. So long as the Social Security scheme qualifies under Section 8(27), which it does, there is no reason why the defendants could not adjust the Plan to take into account any special characteristics of that program. Of course the defendants did not anticipate in 1913 that the Social Security Act of 20 years later would provide for the suspension of government pensions during periods of employment. But they made the authority to reduce service pensions turn on whether a government pension is "payable" and not on whether it is actually received. As will appear from the subsequent discussion of Section 8(28), the Social Security Act is written in such a way that as soon as an individual meets the qualifications for an old-age benefit, he becomes entitled to it regardless of subsequent events. Thus, despite the seeming paradox, the benefit remains payable even though the pensioner will not receive it. The court quite agrees with the plaintiffs that the word "payable" was not chosen in 1914 to meet this situation. But the care taken to make Section 8(27) broadly applicable to future benefit plans resulted in a provision which was also broad enough to encompass a temporary suspension of benefit payments. The continued deduction of OASI benefits during periods of covered employment is also a proper extension of the purpose of Section 8(27). Otherwise, a retired employee who takes salaried employment, which in most cases will pay considerably more than Social Security benefits, would receive a full service pension in addition to his salary, while the unemployed pensioner with only Social Security to supplement his income would receive a reduced pension. The defendants' practice is fairer to the greater number of employees.

Having concluded that Section 8(27) does not prohibit the defendants from adopting this policy, it remains to consider whether, in fact, Section 8(28), as it was added in 1940 and amended in 1949, can be interpreted to have accomplished this result.

When Section 8(28) was drafted in 1940, the Social Security Act Amendments of 1939 were already in force, and several parts of the section specifically refer to the terms or provisions of the Act.

> "From the time when a person retired on a service pension under this Plan is entitled to a 'primary insurance benefit' under the 'Social Security Act Amendments of 1939' the amount of his monthly service pension otherwise payable under this Plan shall be reduced by one-half of said 'primary insurance ben-

efit' subject to the following conditions: * * * "

Two terms in this first sentence of Section 8(28) clearly convey the intention that the offset of Social Security benefits was not to be discontinued when a retired employee took covered employment. Under Section 202 of the 1939 Act, 42 U.S.C.A. § 402, every person who is fully insured, is 65 years of age and has filed an application "shall be entitled to receive a primary insurance benefit". Such person remains "entitled to receive" the benefit from that time on regardless of later events. This is clear from the provisions of Section 203(d), 42 U.S.C.A. § 403(d), which lists certain deductions to be made from payments under the Act, including that required by reason of earning employment wages:

"Deductions, in such amounts and at such time or times as the Board shall determine, shall be made from any payment or payments under sections 401–409 of this title *to which an individual is entitled,* * * * for any month in which such individual:

"(1) rendered services for wages of not less than $15; * * *."

In addition, the "primary insurance benefit" to which the individual becomes entitled is an established amount (computed according to a formula) which is not varied by the application of any of the deductions provided for in other sections. When these two terms are then placed in the context of Section 8(28)—"From the time when a person retired on a service pension under this Plan is entitled to a 'primary insurance benefit' "—the intent to continue offset from the date of eligibility for Social Security becomes clear. The changes in phraseology in the 1949 version of Section 8(28) (which was in effect when Kluegel took covered employment) evidence no intent to change the substance of the provision. The reference to primary insurance benefit was deleted (as it was in the Social Security Act), but

this was necessary since the section was no longer tied to the 1939 Act. The section continued, however, to require offset of the benefit which the recipient "would be entitled to receive", and this language has also continued in the Social Security acts to date.

This interpretation of Section 8(28) as requiring the continued deduction of Social Security benefits when the payment of such benefits was suspended under the Act was not an afterthought on the part of the defendants. When the Bell Plan was in the process of revision in 1939 to reflect the Social Security Act Amendments of that year, each of the defendants adopted an extensive program for informing its employees of the changes in the Plan (Def. Ex. 45, 46, 47). Among other things, a letter was sent in December 1939 to all active and retired employees describing the nature of the changes and attaching a copy of the amended Plan (Def. Ex. 12, 16, 20). The letter also suggested that "employees discuss any questions they may have regarding these amendments to the Plan and the amended Social Security Act with their supervisors." In order to prepare the supervisory personnel for such questions, the defendants had distributed to all supervisors a detailed list of questions and answers (Def. Ex. 13, 17, 21) explaining many aspects of the Plan too detailed to put in the general letter. Question 13 of Part II was as follows:

"If a retired employee is receiving a primary insurance benefit and a service pension which has been adjusted because of such benefit, will there be any change in his service pension, in the event the monthly payments on account of his primary insurance benefit should be changed or suspended for a period by reason of his engaging in employment covered by the Act?

*Answer*

"There will be no change. Once the service pension has been ad-

justed in accordance with Section 8, Paragraph 28, there will be no further service pension adjustment under the present Act because of future changes in the primary insurance benefit payments which result from the retired employee's engagement in covered employment."

In interpretation of contracts it is a sound principle that a court should give effect to the meaning which one party ascribes to the words of an agreement when that meaning is known to the other party. Professor Corbin, who describes this as the expressed intention of the parties, says:

"* * * a party should be permitted to determine the operative meaning of the words of agreement by proving that both parties so understood them, or that he so understood them and the other party knew that he did, or that he so understood them and the other party had reason to know that he did." 3 Corbin, Contracts § 538, at pp. 40–41 (1951).

"We must observe on the other hand, that if the second party knows the meaning that the first party intended to convey by his words, then he is himself bound by that meaning of the words." Id. at p. 42.

This principle is illustrated in Weger v. Robinson Nash Motor Co., 1930, 340 Ill. 81, 172 N.E. 7, where the court expressed it in language similar to that of Professor Corbin:

"* * * Moreover, where the contract is, in fact, understood by one of the parties in a certain sense and the other party knows that he so understands it, then the undertaking is to be taken in that sense, provided this can be done without making a new contract for the par-

ties." 340 Ill. at page 91, 172 N.E. at page 11.

The defendants clearly meant that Section 8(28) was to continue the one-half offset from the date when a retired employee first became entitled to it without regard to the temporary suspension of government benefits when the employee received other wages. This view was directly communicated to all supervisory employees [27] who were provided with a detailed analysis of the relationship between the Bell Plan and Social Security benefits so that they could discuss these matters with the non-supervisory employees. The two plaintiffs who complain of this practice were supervisory employees. Under the terms of a stipulation introduced in evidence by the plaintiffs, it was agreed, among other things, that the memorandum containing the Questions and Answers for Supervisory Employees was received by the persons for whom it was intended. Hurd and Kluegel testified, however, that they did not receive the memorandum (Tr. 543–44, 548). Considering the terms of the stipulation, the detailed and written program for informing employees of the revisions in the Plan, the testimony of the then vice-president of Illinois Bell that the memorandum was distributed to the supervisory personnel and a considerable vagueness which the plaintiffs, as witnesses, demonstrated about documents forming the history of the Plan, the court believes that the defendants did all they could to communicate their meaning to the employees and that the plaintiffs had knowledge of this meaning. There is some evidence that this meaning was also at later dates communicated directly to individual employees. One of the plaintiffs, Seybold, received a form letter at about the time of his retirement which stated that the reduction of Social Security benefits would begin "as soon as you become en-

27. Between 1,800 and 2,000 copies of the memorandum were distributed to supervisory employees of Illinois Bell (Tr. 353), and approximately 4,000 copies were distributed at Western Electric (Def. Ex. 47).

titled to receive said Benefit regardless of whether you fail to make application therefor or engage in 'covered employment' beyond age 65" (Pl. Ex. 35).

The court concludes, therefore, that the defendants' "covered employment" practice was proper under the terms of the Plan and that it reflected the reasonable, as well as the known, interpretation of Section 8(28).

■ In finding the issues in the defendants' favor, the court has not accepted their principal "affirmative" defense—*viz.*, that under Section 3(3) of the Plan, giving the Benefit Committees authority to "determine conclusively for all parties all questions arising in the administration of the Plan", the interpretation by the Benefit Committees of Section 8(27) and the amendments to that provision are conclusive in the absence of fraud or bad faith. As the defendants point out, several courts have held that similar provisions in voluntary, noncontributory plans are valid and that the decision of the pension committee or board will be accepted by the court if made in good faith. See, e. g., Menke v. Thompson, 8 Cir., 1944, 140 F.2d 786; Western Union Telegraph Co. v. Robertson, 1920, 146 Ark. 406, 225 S.W. 649; Clark v. New England Telephone & Telegraph Co., 1918, 229 Mass. 1, 118 N.E. 348; Aston v. Magnolia Petroleum Co., Tex.Civ.App.1951, 241 S.W.2d 306; Webster v. Southwestern Bell Telephone Co., Tex.Civ.App.1941, 153 S.W.2d 498; Magnolia Petroleum Co. v. Butler, Tex. Civ.App.1935, 86 S.W.2d 258; Dowling v. Texas & N. O. R. Co., Tex.Civ.App. 1935, 80 S.W.2d 456; Spiner v. Western Union Telegraph Co., Tex.Civ.App.1934, 73 S.W.2d 566. Compare Forrish v. Kennedy, 1954, 377 Pa. 370, 105 A.2d 67, and Moore v. Postal Telegraph Cable Co., 1943, 202 S.C. 225, 24 S.E.2d 361,

where the courts accepted the general principle but nevertheless overturned the decisions under review. In the Butler and Dowling cases the Texas court implied that such a provision could validly extend to questions of law, as well as of fact. The Eighth Circuit Court of Appeals, in the Menke case, held that a provision making the pension board's decision conclusive on questions of law and fact could be sustained. The plan in that case specifically provided that the board's *interpretation* of the regulations was to be final and conclusive. In all of these cases, however, including Menke, the actual decision before the pension board and before the court on review was one of an administrative nature—that is, applying the various rules and regulations of the pension plan to the case of an individual applicant for benefits. The Menke, Robertson, Clark, Webster, Butler and Dowling cases all raised some question of eligibility under the plan—whether the employee had satisfied the requirement of continuous service, whether a beneficiary qualified as a dependent, etc. Such decisions involve a determination of the facts and an application of the provisions of the plan to the facts. From a judicial point of view these are questions of law and fact—on which the decision of the committee or board, under the decided cases, is conclusive if made in good faith. But they are decisions directed to the routine problems of administration of the plan. In none of these cases was the court asked to affirm the conclusiveness of a pension committee's legal interpretation of an important provision of the plan under which it asserted a broad power to affect the pension rights of all employees. While there are significant exceptions,[28] courts generally do not look

28. E.g., United States v. Wunderlich, 1951, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113 (questions of fact decided by contracting officer under standard form government contract conclusive in absence of actual fraud); Baez v. Disabled American Veterans Service Foundation, D.C.S.D.N.Y. 1954, 119 F.Supp. 490 (decision of defendant as to correct answers in word contest final in absence of fraud or such gross mistake as to imply bad faith).

favorably upon provisions that give to one party to a contract the power to settle for itself any disputes arising under the agreement.

"The judicial mind is so strongly against the propriety of allowing one of the parties, or its especial representative, to be judge or arbitrator in its own case, that even a strained interpretation will be resorted to if necessary to avoid that result." Railway Passenger & Freight Conductors' Mutual Aid & Benefit Association v. Robinson, 1893, 147 Ill. 138, 159–160, 35 N.E. 168, 176.

In Patton v. Babson Statistical Organization, Inc., 1927, 259 Mass. 424, 156 N.E. 534, the court invalidated a provision in the defendant's "Plan" for the payment of deferred salaries that made the decision of the president final as to questions of interpretation or application of the Plan. The court said that Clark v. New England Telephone & Telegraph Co., supra, was distinguishable but did not indicate the basis for distinguishing it.

In the present case the defendants provided that the decisions of the Benefit Committee would be conclusive as to "all questions arising in the administration of the Plan." It seems to the court that in choosing this language the defendants must have recognized the distinction pointed out here and that they did not attempt to assume the authority to bind the plaintiffs in a case like this. The practical result is that the court has not confined itself to a review of whether or not the defendants acted fraudulently or in bad faith in interpreting and applying the Plan as they did.

On the contractual aspects of this case it may be agreed that the court's task has been to determine (1) the intended meaning of Section 8(27) and the amendments to the Plan, and (2) whether the offset practices of the defendants were consistent with, or violated, the Plan as so interpreted. The process of arriving at the "intention" of the parties is seldom an easy one. It was particularly difficult here because many of the accustomed rules governing the circumstances and the relevant evidence that may be considered do not fit the framework of this case. The Bell Plan, although an enforceable obligation, was a voluntary and gratuitous undertaking on the part of the defendants. It was not discussed with employees before it was announced, nor have the terms been the subject of discussion or negotiation since then (at least not until 1952 when we are told the defendants began to include the Plan in collective bargaining negotiations). Unlike the contracts involved in most litigation, the Bell Plan was not a bargained-for agreement. This circumstance does not mean that the only "intention" to be considered was that of the defendants. When the unilateral offer of a pension became enforceable at the instance of employees who had performed their part of the agreement, their understanding also became a factor to consider. But there is virtually no independent evidence of what agreement the plaintiffs, or any of the employees, thought they were sealing by continuing in the employment of the defendants. One of the plaintiffs testified that he had not even read the Plan and that he became interested in it only at the time of his retirement. His knowledge of pension rights came from a supervisor and "hearsay". (Tr. 544, 545). The reluctance of employees to study a long, and sometimes technical, pension plan is perhaps understandable. But their rights come from this Plan, and it is difficult to weigh their understanding of these rights knowing that in some cases it is not based on a close familiarity with the terms of the Bell Plan.

There is, on the other hand, abundant evidence of what the defendants believed the Plan meant. While the court could not permit the defendants to create the right to offset Social Security merely by declaring that it existed, neither would

a proper result be achieved by ignoring as self-serving all of the explanations which the defendants have made of the Plan as they have adapted it to new circumstances. Whenever in this process the defendants have made known their intended meaning to the employees, or every reasonable step has been taken to inform them, the court has given considerable weight to such expressions. The evidence of uncommunicated meaning (intra-company letters and memoranda expressing the intended scope of the Plan before the advent of Social Security) has been referred to in support of the court's independent conclusion, based on the language used and the date of the original Plan, that Section 8(27) was designed for the deduction of Social Security benefits. In this way the court has attempted to reconcile accepted principles of interpretation with the special nature of a pension contract like the Bell Plan.

The decision is in no way a judgment of the merits of the offset device. The court has concluded only that the Bell Plan authorized the deduction of Social Security benefits in the manner followed and that no rule of law, including the Social Security Act, makes unlawful a pension system which takes advantage of governmental benefits to which employees subsequently become entitled. Whether the integration of a private pension plan with Social Security to produce the results found in this case is good policy or unfair and misleading to the employees is a question which the court cannot decide for the parties in this action.

The court takes this occasion to express its appreciation for the assistance rendered by counsel for all parties in the filing of exhaustive and scholarly briefs and arguments.

There will be a finding of the issues for the defendants and against the plaintiffs with costs against the plaintiffs. Counsel for the defendants will kindly submit a judgment order on or before October 7, 1955.